Good morning, Your Honors. May it please the Court. Josh Benson on behalf of the plaintiff and appellant, Stone Creek and its attorneys. I would like to reserve five minutes for rebuttal. The central issue before this Court is whether the Lanham Act would ever condone the intentional theft, copying, and use of another's trademark and placing that trademark on identical goods sent out into commerce. We urge this Court to answer that question in the negative, that the Lanham Act would never condone such intentional actions. The District Court committed clear error when it condoned Omnia's intentional theft of its own client's trademark and put that mark out into... Well, let me ask you that because it seems like it sort of revolves on the confusion determination, right? Yes, Your Honor. And so, you know, and I always look next to, okay, was this a summary judgment? Was it a trial? And then, okay, we have a trial here. So we have someone that heard all the evidence and went through the factors. And then you both have, you have conflicting experts, all right? And there was an expert that was called by the other side that came to some conclusion that, I don't know, it was something in the 90s, 90 percentiles, as to that, how they did their business. And so if he relied on their expert and found their expert more credible than the expert that you put forth, how do I find clear error on that? What's your best argument for that? Two points, Your Honor, and I believe you're talking about the survey evidence done by their expert, Mr. Cowan. First, we've challenged that survey that it should first be inadmissible because it was hearsay. The surveys were not disclosed to us. So you're right, the court relied heavily upon those surveys, which should never have been admitted into court. The court did admit the surveys on the ground of present sense impression, but that's not what the You're shown two different purses, for example, and you ask, where do you think this purse comes from? Who makes it? And somebody gives that answer. That's a present sense impression. Here surveys were sent out asking people to give their knowledge, not their present sense impression, but what they know in the furniture industry. And when you're doing that and you want to rely on the residual hearsay exception, you have to disclose the name and address of the declarant because that would allow us to meet that evidence. We'd be able to go talk to those people. Tell us why you don't know or you do know of Stone Creek. And the district court committed an abuse of discretion in admitting that in. But Your Honors, I don't even know if you need to get there because the court relied on that survey evidence for geographical separation and kind of said, you know, the survey evidence on geographical separation, it's going to overcome all the sleek craft factors, that we don't need to pay attention to the sleek craft factors because of this geographical distance. Here's the problem. An intentional copying of another's mark. That's the distinguishing factor between a lot of cases that rely on geographical distances. Opposing counsel, excuse me, Omnia. But you're arguing clear errors. So, and I know that the factor, you know, there isn't, it does, seems to be undisputed that it's the same mark. Yes, Your Honor. So that seems to be, and that's a really important factor. Yes, Your Honor. But if, it seems to me almost have to get me to a matter of law. Yes, Your Honor. And they misapplied the sleek craft factors. So when we look to the matter of law, right, I urge this court to follow the where Brookfield enunciated an important point. And it says, when you have virtually similar marks, here we have identical marks, they admit they took it from our client, our person, their client, and you put it on identical goods, confusion is going to follow as a matter of course. That's also the. Is it as a matter of law though? I think it should be as a matter of law. But is it? Is that the law? Well. If that's only the, if that factor is satisfied, which here it is. Yes, Your Honor. Does that mean, give me a case that says you don't still have to look at the other factors. I know it's really an important factor. Well, courts will look at the other factors. Well, let me ask you about the other factors. So it seemed to me that the court may have misapplied, as a matter of law, the question of the strength of the mark. Because the court didn't look at all, as I understand it, and maybe the other side can point me to it, to really what we normally look at in strength of the law as to whether is it generic, is it descriptive, is it suggestive, is it fanciful and arbitrary. Did the court make any determination on that? Yes, the court found that the mark was strong in the Arizona market, but not in the Bonton area. But that's not a question of the nature of the mark. That's a geographic determination, correct? Exactly, Your Honor. This mark was arbitrary and fanciful. The strongest of all marks entitled to the full protection of the Lanham Act. Now, when you have that, you don't need to get secondary meeting in the markets. You just have this one mark and it's given the full protection. But the court set that aside. And we don't know the weight that the court gave the strength of the marks because it's not in the decision. They just said, well, it's strong in Arizona, not here. But it is a fanciful mark. And you are correct, Judge McKeown, that it is entitled to the full protection of the Lanham Act. And so when we look at all these factors, we get to the clear air because we have the optician's decision out of the Third Circuit. Identical marks, identical goods, confusion is inevitable. We have the case out of our own circuit that I mentioned earlier out of Brookfield. We have a New York case that holds on to the same principle. Now, when you look — Let me ask about willfulness. Because — Yes, Your Honor. As I understood the District Court, that he discounted willfulness because they said, look, we weren't really trying to trade on you. We just needed a mark. So we kind of pulled this one out of the hat. That then comes down to a question of, well, how does one define willfulness under the sleek craft factors? And I'd appreciate your comments on that. Yes, Your Honor. And if I may seek a little bit of clarification, willfulness under the sleek craft factors, the intent factor — The intent. Correct. So the intent factor under sleek craft is different than willful under disgorgement of profit. Right. And I probably misspoke. I meant intent. Intent to — Thank you, Your Honor. So the intent factor that — you're correct. The Court erred again in saying, Stone Creek, Omnia did not intend to trade off your name. Therefore, the intent factor, we assume the Court weighed in favor of Omnia. But now if you look at the intent factor, both the sleek craft case and the Brookfield case both make clear that when one person knowingly adopts someone else's mark, the intent factor weighs in favor of the plaintiff. So now we've got the intent factor, similarity of the marks, strength of the marks, proximity of the goods, all weighing in favor of Stone Creek, four key elements of the sleek craft factor, which shows the District Court's error in saying that those factors did not weigh in favor of Stone Creek. Now we go on to evidence of actual confusion. Once again, the District Court said there was no evidence of actual confusion. The District Court erred in this respect. Its own order cited several instances of actual confusion by consumers. The Court seems to be under the impression that confusion can only result when a purchaser purchases a product thinking it was manufactured by someone else. This circuit has repeatedly stated that there are other forms of confusion. Those forms of confusion cited in the order show customers in the Bonton store, I want to inquire about additional products. Do you have it in this form or this form? And the one form of confusion by Mr. John Bava, that's the one that got Stone Creek, oh, someone took our mark, what's going on here? Mr. Bava calls Stone Creek. Luckily when that phone call came in, the president of Stone Creek was nearby and took the call. And he asked him, well, what's going on here? Mr. Bava says, I bought a couch of yours in Mr. Bava sends Stone Creek the warranty card and on that warranty card is the identical trademark. Another instance of actual confusion where this gentleman is seeking to get warranty repair information thinking Stone Creek was the manufacturer of the couch he bought in the Bonton area. Now, those instances of actual confusion, when Stone Creek learned of it, they sent an email to the vice president of Omnia. Are you guys using our mark on product? The vice president responded, yes, we are. And the important part of that email when the vice president responded was I understand in this day of the internet, of internet shopping and surfing, that this can be a nuisance for your company. He recognized the power of the internet and bringing the Bonton area and Arizona together. The president of Stone Creek then did a search on Google, which is put into the record, Stone Creek Furniture. Stone Creek, Arizona appeared first on that search result. And third, Bonton selling the infringing Stone Creek product. And this again goes into the marketing channels that are used. Another sleep craft actor, the court aired where there was no common sleep craft, excuse me, no common marketing channels. We see that the power of the internet not only led consumers to Stone Creek, but it led Stone Creek to find out where the product was being sold by doing research on the internet. They had convergent marketing channels on the internet, which this circuit has held, makes confusion more likely. So the marketing channels, strength of the mark, evidence of actual confusion, similarity of the marks, and intent all weigh heavily in favor of Stone Creek. And the district court aired in concluding it didn't. To touch upon the geographical location, because the district court did say, well, it doesn't matter the way the sleep craft factor weighs because of geographical distances. That factor should be set aside given the intentional infringing conduct by Omnia. If we look at the Brennan decision, and counsel says, please adopt the Brennan decision. The Brennan decision out of the Second Circuit says, in the absence of actual confusion or bad faith, geographical distances is a factor. Here we have bad faith use of our mark. They took it and they ran to a different circuit or a different area of the country to use it and wanted to act like no big deal. Also gone on territorial differences, we look at the Tillamook smoker case. And this is what I think kind of also was an air with the district court, and it's repeated throughout Omnia's argument, is this concept of competition. Competition is not the test, as Tillamook pointed out. The test is not even confusion. It's likelihood of confusion. And as Tillamook pointed out, despite geographical distances, if we know somebody is using our mark and it's likely to cause confusion, Stone Creek had an obligation to file suit to protect its mark or to face a latches defense and not be able to ever bring it. And that's what they did here, to protect their mark. Also regarding geographical distances, the court ignored that Stone Creek had over $600,000 worth of sales in the Bonton trading territory. Now Stone Creek has over $200 million in sales bearing the Stone Creek mark. Because of that great amount of sales that they have accomplished bearing that mark, the district court discounted the $600,000 in sales within the Bonton trading territory, but still acknowledged it. So when did you determine that you were not going to seek your lost profits? Your Honor, we determined that as we were getting ready for trial. Actually, once we got an expert done, we decided at that time it would be too hard to prove. So we supplemented our decision to identify that we were going to seek disgorgement of profits. Well, it's to me that you made that determination long before you notified Omnia of that decision, because throughout discovery you told Omnia that your profits were going to be determined by an expert. However, you never asked your expert to make calculations in light of that. How did the district court abuse its discretion in finding bad faith? Well, I think that, Your Honor, to briefly touch upon it is the standard of Section 1927 is that we vexatiously multiply these proceedings. And once we disclosed our expert and at that time indicated or didn't update that we're seeking our own profits, you know, the circuit allows us to proceed under that, to seek both types of damages. And when one proves too difficult, we could shift and elect our remedy, is which what we did. And so I think the district court abused its discretion on that factor. And briefly on willfulness, Your Honor, it's our position that willfulness is no longer a requirement. Given the 1999 Amendments to the Lanham Act, willfulness is not a requirement to seek a disgorgement of profits. The plain language of Section 1117 indicates that Congress intended to condition monetary awards for Section 43C but not Section 43A on a showing of willfulness. So the district court committed error in requiring us to show willful infringement to seek a disgorgement. Notwithstanding that, we... Well, but what is it, 56 Hope Road? Yes, Your Honor. It stated an award of profits is not automatic upon a finding of infringement. So why doesn't that statement foreclose your argument that it is undecided in this circuit whether willfulness is still required after the 1999 Amendment? In 56 Hope Road, the circuit was never asked to address the 1990 Amendments to the Lanham Act. 56 Hope Road appeal was brought by the defendant who in the lower court was found to be a willful infringer. Therefore, the standard of willfulness or whether the 1999 Amendments abrogated this circuit's prior position. So 56 Hope Road, they were never asked to. And if you look at 56 Hope Road, I think it helps into identifying what the willfulness standard is. Because in that case, willfulness was found because the defendant received a phone call saying, you do not have the right to use the Bob Marley image. And they used it anyways. The 56 Hope Road, echoing Lindy Penn, found that willfulness is deliberate, false, misleading, fraudulent. All the similar acts of omni in this case. Your Honor, I'd like to reserve the remaining time for rebuttal unless you have any questions at this time. You may reserve. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. My name is Dan DeCarlo, and I'm here with my colleague, Annie Lewis, and we represent the defendant and the appellee in this case, Omnia. The Omnia's use of the Stone Creek trademark, Your Honors, caused absolutely no consequence to either party. My client did not gain anything, and the plaintiff did not lose anything. With regard to my adversary's comments about sleek craft, he indicated that the Court did not consider the sleek craft factors. To the contrary, the Court went through a very detailed analysis after a four-day bench trial on each and every sleek craft factor. This Court, for at least four decades, has indicated time and time again in assessing trademark infringement cases that it is a flexible doctrine. These are not factors which are to be applied rotely. Each case is different, and therefore, the test is to be applied flexibly. Well, they may be flexible, but if the district court errs as a matter of law, then we have a potential problem. So let me ask you about some of the determinations. One has to do with the strength of the mark. Do you have any case where when the strength of the mark is an arbitrary or fanciful, that somehow the geography weighs in, as opposed to a suggestive mark? Your Honor, the issue of strength, and to address the Court's specific question about a case, I apologize. I do not have a case at my fingertips. I've been practicing trademark law for 20 years. I can explain the concept, though. I can almost see the strength of the mark goes to the ability of the consumer to associate a mark with a particular source. Correct. The scale of marks, generic, mere descriptiveness, suggestiveness, arbitrariness, and suggestiveness, that's a scale that is part of the strength of the mark analysis. But ultimately, it's just one of the tests. So an arbitrary and a fanciful mark and even a suggestive mark is deemed to be stronger. Why? Because apples, when applied with computer, doesn't describe a computer, so it's a stronger mark. But what it ultimately goes to is how is the consumer able to recognize the mark? So it is possible, and in this case it was established, that a mark may be strong in Phoenix, Arizona, but the consumers in the Banton trading territory, which is what was at issue, had absolutely no knowledge of that mark. So in my little community in Signal Hill, there's a very famous restaurant right down the corner from me. Everybody in town knows it, but nobody in New York knows what that restaurant is. So that restaurant has a strong presence, a strong mark in Signal Hill, California. Give me the case, though, where the strength, if you're looking at channels of distribution, then, of course, you look at some of the geographic issues in channels of distribution, whether it's internet or whether you look at physical presence. But I don't understand the strength of the mark to be grounded in a physical geography. It is grounded, Your Honor, in the consumer's ability to identify the goods or services with the mark. The key market here is the buyers and sellers... Apple. It's basically, it has nothing to do with furniture. Arbitrary. It's an arbitrary mark, fanciful mark, under the trademark hierarchy. But then if you go to, well, is there any actual consumer confusion, when you have a consumer who says... And we're looking at source. We're not looking at competition. Do you agree with that? We're looking at what is the source of the goods. I don't agree with that, Your Honor. Tell me why. And this was in the comments about the issue with Brookfield and Lindy Penn. It is not an accurate statement under this Court's precedent to say that same mark on the same goods equals likelihood of confusion. No, I don't think the cases say that. As a matter of... And he acknowledged that. Brookfield, which Mr. Benson cited to, specifically notes this concept of, and I'll just read it. So, Your Honor, it's not true that... This is what Brookfield says. If on the other hand, Brookfield and West Coast did not compete to any extent whatsoever, the likelihood of confusion would probably be remote. That wasn't a case where the marks were the same. So here we have a situation. Marks were the same. Goods are the same. The District Court concluded after four days of testimony, there's absolutely no competition here. We have the likelihood of confusion, and we've tested for likelihood of confusion, shopping within a 200-mile radius, or within a radius of furniture galleries in the Midwest and the East Coast, what we refer to as the Bonton Trading Territory. Well, how do you explain then these e-mails and these phone calls about people calling and contacting the Arizona and saying, so where's our warranty? First of all, Your Honor, the District Court concluded that was not actual confusion. And in fact... Why isn't that actual confusion? The case of Cone v. Petsmart, that's a Ninth Circuit case, Your Honor, 281F3rd. Professor McCarthy also talks about it in his treatise. Inquiries are not the same as actual confusion. Actual confusion requires that the consumer actually knew who, in this instance, the plaintiff was. The situation is the consumers are at a Bonton retail store. They see the furniture. For whatever reason, they leave. They punch it up on the Internet, and they are directed and find the plaintiff's site. That's not actual confusion. That's inquiry evidence. And what's critical to understand in this case, Your Honor, because everybody has websites, and we cannot, and this Court has said and other courts have said, the mere fact that you have a website doesn't mean you do business everywhere in the world, lest we would have no marketing channels, because everybody would do business everywhere. No, but they did something to the neighborhood of $600,000 of business out there. Your Honor, over... I know it's small. Over 20 years and over $200 million in sales, they claim, although that evidence was not at all clear in the record, that they did 150 transactions, 150 transactions over 20 years, in the Bonton trading territory. But the evidence at trial also showed they never deliver any product out of state. So it was, there was no explanation at trial as to how on the one hand they could say, we never deliver products out of state, yet we made sales to these entities. I read that testimony, and maybe you can help me. I thought what they were saying when I read the testimony was, I don't know if it's called free on board or whatever, which is basically, here's my factory, and if you want it shipped, I don't, you tell me where it's going and the name of the shipper, and we make the arrangements, and then out it goes. Is that not what they said? I believe the testimony from the plaintiff was, these are addresses that we put in our offices, somebody comes, either we deliver it locally, or someone comes and picks it up. Now, we introduced evidence. Well, they didn't say, okay, what about the testimony where they say you get a shipper and then we use a shipper and then we ship it out? Did I, I thought I read that in I believe the plaintiff indicated basically volume two of the excerpts of record. I believe that's accurate, Your Honor. Somebody comes up and somebody comes and picks up the goods. A shipper comes and picks up the goods. But that, there wasn't testimony that in those 150 instances, those goods were shipped across the country, that a $2,000 couch was shipped across the country. We tried to find out that evidence, but we, the plaintiff wouldn't give us access to their customer list. So we were thwarted because we were scratching our heads saying, this doesn't make any sense. Who's going to do this? And in fact, I believe, if I'm remembering correctly, there was evidence presented at trial that Arizona, of course, is a heavy snowboard state. So we have a lot of people with billing addresses in the east who may be using their resident's address for purchasing the items in Phoenix, Arizona. Let me ask you a sanctions question. I'm having a little difficulty seeing why sanctions were awarded in this case. Starting with the first sanction order, how can Stone Creek's willfulness argument be frivolous if our circuit model jury instructions specifically state that we have yet to determine whether the amended statute requires willfulness? There's two sanction orders, Your Honor. The first sanction order was a result of a summary, a second summary judgment motion that the plaintiff filed on a duplicative issue. So there was a round of summary judgments. Plaintiff moved for infringement. The court said there's a triable issue. Plaintiff filed a second summary judgment asking the district court said we already had a summary judgment on the issue of infringement. That's a triable issue. So the court found that bringing the second motion on summary judgment, asking the court to adjudicate infringement, which the court had already said was a triable issue, was a 1927 violation. The second sanction order resulted from what Your Honor picked up earlier on, which was the repeated representations that they were not going to be seeking damages. I believe nine times in Rule 26 disclosures they identified that they were going to be seeking damages. In the deposition of their expert, which I do recall taking, I asked him specifically, what are you here to opine on? He said it was on our client's profits. And I said, well, did anybody ask you to compute the damages, the plaintiff's lost profits? No one has ever asked me to do that. So up to that point, we had hired our own expert, had our expert consider the issue of damages at some expense, and we took depositions of third parties trying to defend against what ultimately ended up being a phantom damage claim. And the district court found post-trial that that was a sanctionable event. And I would indicate in both of those situations, Your Honor, the court did not abuse its discretion on the sanction question. Getting back to the likelihood of confusion question, Mr. Benson mentioned that you cannot steal a trademark, that the Lanham Act doesn't approve the stealing of trademarks. Your Honor, I think a misconception of this case from day one is that trademarks are somehow tangible assets, or that you do not steal trademarks. Trademarks are intangible assets which only represent source. So you can infringe a trademark. And as this Court has said time and time again, that infringement analysis requires testing the perception of the likely consumer. And that is what the whole likelihood of confusion, sleek craft factor analysis is all about. My adversary, the appellant, had to prove at trial that an appreciable number of relevant consumers are likely to be confused as to the source of Omnia's goods. We submitted substantial evidence at trial, Your Honor, that there was absolutely no recognition of the consumers in the relevant geographic region, which is the Banton trading territory, that they had any recognition of the plaintiff. That's what our survey expert was all about. That was Dr. Cowan. And Dr. Cowan's survey was solely related to consumer recognition. This Court has determined time and time again that the issue of whether a survey and a survey expert should be admitted is up to the sound discretion of the District Court, which will only be disturbed for abuse of discretion. There's nothing in the record that suggests that Dr. Cowan's methodology was improper or that the results of his survey were improper. On the issue of intent, Your Honor, that is one of the factors. And now I'm talking about the factor from the sleek craft, from the sleek craft factors. Intent is not mere knowledge. Just because you know who a plaintiff is or a plaintiff's mark is when you adopt your mark is not intent. Intent does require some kind of effort to coattail, to believe that you're going to profit, to trade on the goodwill of your adversary. The District Court, who heard the facts in this case, was in the best position to determine whether or not my client, when choosing this mark, had an intent to trade on the goodwill of the plaintiff. And the test But we have, that's where you go back to Brookfield. And they basically, you know, it seems to me a pretty thin argument to say, yeah, we know it's your mark, and we don't really mean to harm you. We just like it. So we're going to take it. That can't be the law, which is why Brookfield talks about intent means if you adopt the mark knowingly, either actual or constructive knowledge, that it's somebody else's mark. Isn't that what we have here? No, Your Honor. What we have here is absolutely and I would disagree with Your Honor's premise. I could take a trip to Naples, Florida, and I can see an ice cream store there that's got a really cool name that I really think is neat. I wish I could come up with it right now, but I just really like the name. I come back to my little house in Signal Hill, California, and I start an ice cream shop, and I use the same name. I'm not willfully infringing anybody's trademark. I'm not even infringing. No, no, but that's a different question. Willful infringement is different from intent. It is, Your Honor. You agree with that? The willful infringement under the Big Pen case and 56 Hope Road is, I would say, a slightly different inquiry. But intent, as part of the likelihood of confusion factors, still requires, Your Honor, that the defendant accused of infringing had some desire to want to trade on the value of that mark. And the value of the mark is not because I think the mark is a cool-sounding name. The value in the trademark is in its ability for the consumers to recognize that mark with a particular source of goods. So my adoption in Signal Hill, California, of an ice cream store with the same name of an ice cream store I saw in Naples, California, is not an intent to trade on that goodwill because there is no goodwill in the area where I'm adopting an ice cream store. So the court heard the testimony of Mr. Zolfarino, my client, about that issue and concluded that basically what he did was he chose the name for expediency. And again, it didn't harm our adversaries at all, and it didn't help my client at all. Had that name not been chosen, some other name would have been chosen. But they chose the name in the same, same name and the same field. They did. And it ended up having zero impact on either party. My client... But that's another, that's a question of damages, isn't it? No, it goes to intent because my client knew at the time that he adopted the mark that it was going to have no impact. He's been in the furniture business, as he testified, his entire adult life. He, and he was very familiar with the plaintiff. He knew they were a local Phoenix company. He knew that the mark was going to be used in a geographic region where the two would never mix. These, this, this furniture market, which was critical to the court, the district court's decision, is a very localized market. Yes, people use their websites and internet to advertise. But with regards to furniture, your honors, people still very much go to their local furniture store to buy big ticket furniture items. Most people are not buying $5,000 couches on the internet. So the court, that was a significant driving factor in the district court's conclusion of no likelihood of confusion. I think I've covered... One moment, your honor. I think I've covered all my points. Briefly, your honor, on the T. Rose Doctrine. If for some reason this court were to find that the district court erred in its application of the sleep craft factors on infringement, the court in a summary judgment motion, the district court in a summary judgment motion that we filed, found that the T. Rose Doctrine did not  look at that because the T. Rose Doctrine says that if a junior user, that would have been our client, adopts a mark in a remote area and in good faith, that there is no infringement. And this relates to common law marks. And I'll remind the court that at the time that this dispute began, the plaintiff's mark was a common law mark. It was not registered until 2012. But doesn't the T. Rose Doctrine go on to say something to the effect of that you adopt it and it's without knowledge of the other person's mark? That's the key. There's a split of authority, your honor. This court has not addressed that question. Some courts have said good faith is destroyed, which is what our district court ultimately relied upon, if there's any knowledge at all. Other courts say that the knowledge has to be of an inimical intent. And what I would point the court to is the 1916 case, so 100 years ago, and United Drug and Theodore Rectanus, which is a 1918 case. And both of those cases and talk in applying common law, the common law T. Rose Doctrine, talk about good faith and this concept of an inimical intent, this kind of concept I was just talking about, trading on goodwill. So this court did not, the district court did not adopt that good faith definition, instead said you had knowledge T. Rose destroyed. If the court for some reason were to disturb the district court's infringement finding, then I would request that an alternative basis for our client to prevail would also be the T. Rose Doctrine. And then finally, your honor, on the remedies, if this court were to reverse the case, again, the plaintiff has already acknowledged that they are not seeking any damages. The disgorgement question is only relevant if the court were to find willfulness under the BICPEN standard and the 56 Hope Road standard, which the district court was, again, in a great position to review. And this court would have to find that he committed clear error in those factual findings. With regard to the 1999 amendment, the 1999 amendment was dealing with the dilution section of the Lanham Act. That's 43C. That is not the trademark section. It was amended to require that a willful violation of dilution is what's required in order to get remedies. And as the Federal Circuit recently held in a 2016 case, Romag Fasteners specifically noted that it, the Federal Circuit, did not believe that the 1999 amendment abrogated 56 Hope Road, for example, because there was no indication that Congress in 1999 intended to make a change in the law of trademark infringement as opposed to dilution. It was fixing a technical error. I'm sorry, Your Honor. Congress was just fixing a technical error. They were fixing a technical error in the dilution statute. It had nothing to do with trademark infringement. My time is up, Your Honors. Thank you. Unless you have any other questions, thank you very much for your time. May I ask you kind of a bottom line question? If the district court were reversed with respect to likelihood of confusion and infringement, and if there were a likelihood of confusion, and if the other side is not saved by T. Rose, but you still need willfulness, where does that leave you? Well, I think that's why we asked this court on summary judgment to reverse the district court's position. The district court took a very, very narrow view that willfulness requires an intent to trade off the goodwill and name of another. And I think that's what we have here, because they took the name, one with substantial goodwill, $200 million, and used it. And if you look at cases throughout our circuit and district courts throughout our district courts, you need to exercise due care before you use a mark. And if you don't, that's a signal of willful. Do you think that's a question of law based on this record? Yes, I do, Your Honor. I do. Because we know they didn't ask corporate counsel. And I think this is important. Mr. Zolfarino came to trial and he said, oh, I know the furniture business, and despite testimony that you could put furniture in a basket, he said, nope, it's a local regional area. Well, when we first called Omni out on it, they said, hey, we understand the surfing of the Internet and the complex issues that could raise. But Mr. Zolfarino never contacted trademark counsel. Just before using this mark, Mr. Zolfarino signed a verification of a complaint suing a court in Florida or suing a company in Florida for putting the Omni name on its website. After using the Stone Creek mark in 2008, he sued another company for putting the Omni name. And so he knew. That goes to the willfulness of his actions. And if you look at the California case and there's even a Federal Circuit case, that if you're in this position and you know and you don't use reasonable care, that's a sign of infringement, of willfulness. The facts aren't heavily in dispute on what they did. They took the client's mark and they used it. And they want to ask this court to approve a roadmap for future trademark pirates. Take any mark you want, no matter how successful in the area, go to a different jurisdiction and start using it and it's okay. That's their position. I strongly disagree with counsel's representation that he can steal a mark of an ice cream shop in Florida and start using that exact same business in California because of the intent, because he knows what's going on and he knows the intent. And Mr. Zolfarino, he admitted, and it's in the court's order, he never asked Stone Creek if he could use the mark. He never researched where Stone Creek did business. He never researched the geographical scope of Stone Creek. And despite having trademark counsel, never asked counsel, is it okay if I use this mark? He never did any of that. That goes to willfulness. And if you look at 56 Hope Road, it is forceful labels of deliberate, false, misleading, and fraudulent. And, Your Honor, the T. Rose case hasn't been appealed. The T. Rose decision of the lower court, that is, has not been appealed. And so we'd ask this court to set that aside. But even if the court got it right, they adopted the majority decision that if you know if someone else's mark and you use it, you're a bad faith user of that mark, not entitled to the protections of T. Rose, and you've got to be held accountable. It hasn't been appealed. But if it could be another alternate ground on a summary judgment for affirmance, could it not? I would argue that. I mean, depending on how you come out on T. Rose. Certainly. And I would argue that that would have been Omnia's job to appeal that specific decision if they wanted it. But in it, if this court does consider it, they're a bad faith user of the mark. And I implore this court to adopt the majority position because it enforces the purpose of the Lanham Act to protect trademarks. Thank you, Your Honor. Thank both counsel for your argument this morning. The case just argued is submitted. Stone Creek versus Omnia, Italian design. And we are adjourned for the morning. Thank you.
judges: McKeown, Callahan, Quist